**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LAWRENCE E. PRATT, | : | |
| | : | |
| Petitioner, | : | Civil Action No. 09-4046 (RBK) |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| KAREN BALICKI, | : | |
| | : | |
| Respondent. | : | |

**KUGLER**, District Judge:

Petitioner Lawrence E. Pratt ("Petitioner") filed the instant Petition ("Petition"), seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254(a), and challenging a judgment of conviction in the Superior Court of New Jersey.  Respondent filed an answer to the Petition, and Petitioner traversed.  For the reasons expressed below, the Court will dismiss the Petition and will decline to issue a certificate of appealability.  See 28 U.S.C. §§ 2253(c), 2254(a), (b), (c).

## I.      STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts. Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996). Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens v. Delaware Correctional Center, 295 F.3d 361,

2

368 (3d Cir. 2002).  Where a federal claim was "adjudicated on the merits" [1] in state court

proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

> (1)    resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal Law, as determined by the
> Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the

governing law [as it is interpreted or] set forth in [the Supreme Court's, rather than in any state

court's or any circuit court's] cases' or if it 'confronts a set of facts that are materially

indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different]

result."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

In other words, under the "'unreasonable application' clause, a federal habeas court may

grant the writ if the state court identifies the correct governing legal principle from th[e Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.

at 413.  Whether a state court's application of federal law is "unreasonable" must be judged

objectively, which means that an application may be incorrect, but still not unreasonable.  Id. at

409-10.

---

[1] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."  Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).  A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever; such determination is nonetheless subject to same degree of deference for the purposes of the court sitting in habeas review.  See Harrington v. Richter, 2011 U.S. LEXIS 912 (U.S. Jan. 19, 2011).

A court begins the analysis by determining the relevant clearly established law.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.   A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

II.     FACTUAL AND PROCEDURAL BACKGROUND

The factual events, as presented by the State's witnesses during Petitioner's trial, were as follows:

During evening hours of June 24, 1998, a certain Kevin Pretlow ("Pretlow") was in his apartment.  At that time, Pretlow was engaged, and he and his fiancée were saving money to move in a jointly-held residence.  The saved money, in the amount of $3,000, were held in a safe located within Pretlow's apartment.

Pretlow, not feeling well, laid down on a couch trying to get some rest.  As he was laying on the couch, he heard a knock at the door of his apartment.  Apparently, he looked through a window and saw a certain Michael Speller ("Speller"), whom Pretlow had known from a while ago, but whom he had not seen for some time.   Recognizing Speller as a familiar face, Pretlow opened the door just to see, to his surprise, that Speller arrived with two other individuals, a certain Darnell Taylor ("Taylor") and Petitioner.  All three arrivals entered Pretlow's apartment. At that point, Petitioner was armed with a sawed-off shotgun, while Speller had a handgun.

Upon entry of Pretlow's apartment, Speller demanded money.  In response, Pretlow claimed he had none.  Petitioner then pushed Pretlow to the floor, hit him in the head with the

4

shotgun, and kicked him.  As Petitioner continued kicking and beating Pretlow with the shotgun,

Pretlow kept trying to crawl away, first making his way into the hallway and then into his

daughter's bedroom.  As that point, Speller handed his handgun to Taylor, and Taylor was

instructed to watch Pretlow (who was ordered to lie on the floor), while Petitioner and Speller

initiated a search for money throughout the apartment.  Since Pretlow continued to move during

this search, Petitioner – at a brief moment when he re-entered the bedroom – kicked Pretlow

again, saying, "didn't I tell you don't move?"

Still trying to escape, Pretlow hit Taylor with an iron, after which Taylor took the iron

away from him and beat Pretlow on the head.  Pretlow then threw a portable heater through the

bedroom window: he was trying to get attention of the people outside; that act seemed to be

successful, since Pretlow's "visitors" left his apartment.  However, by that time, they already

found and took away with them Pretlow's safe containing, in addition to the $3,000 in cash,

Pretlow's checkbook, his insurance documents, his fiancée's jewelry, etc.

Carolyn Fulgham ("Fulgham"), Pretlow's neighbor, observed the fact that three men were

leaving Pretow's place.  She noticed that one of them was carrying a shotgun and another had a

box, fit in size to be Pretlow's safe.  She also noticed that the three had a problem fitting the box

in the trunk and, thus, had to put it on the back seat of their car.  The three eventually fled in their

vehicle, as Pretlow began wandering outside the apartment building bleeding from his head and

body.  Consequently, Officer William Lee ("Lee") was dispatched to the crime scene, where he

found Pretlow and examined Pretlow's apartment.  He noted that the apartment was in disarray,

with blood on the floor; together with that, he took Pretlow's statements as to what happened.

After that, Pretlow was taken to the hospital where he received stitches to his head and treatment for his bruised ribs.

At about the same time when Lee was dispatched to Pretlow's appartment, Officer Brian Milsted ("Milsted"), a patrolman, spotted a Toyota Camry driven at a high speed away from the apartment complex where Pretlow lived.  Since the Camry failed to stop at a stop sign, Milsted activated his overhead lights and directed the Camry to pull over.  The Camry initially complied but, when Milsted began approaching it, the Camry sped away.  That caused Milsted to resume his pursuit, and he followed the Camry to an unlit section of a parking lot, where the occupants of the Camry jumped out and fled on foot.  Upon his examination of the abandoned Camry, Milsted found a sawed-off shotgun, a handgun holster, Pretlow's safe, and an open container of alcohol.  The Camry was later identified as belonging to Petitioner's wife.

After the police put together the identity of the Camry with the facts provided by Pretlow, Fulgham, Lee and Milsted, arrests followed.  Petitioner, Speller and Taylor were charged with assault and robbery.[2]  At Petitioner's trial, the State's witnesses testified, in great detail, to all of events discussed above.

Petitioner was tried separately from Speller and Taylor.  Having ample prior criminal record,[3] Petitioner elected not to testify in his own defense.  However, his post-arrest statement

---

[2] Petitioner was convicted on the charges of first-degree robbery, assault, possession of a shotgun and possession of a weapon for illegal purposes.  Speller was convicted on the charges of second-degree robbery and assault.  See <<https://www6.state.nj.us/DOC_Inmate/details?x= 1232406&n=13>>.  Speller unsuccessfully appealed his charges and conviction.  See State v. Speller, 177 N.J. 576 (2003).  Taylor was convicted  on the charges of second-degree robbery. See <<https://www6.state.nj.us/DOC_Inmate/details?x=1241116&n=1>>.

[3] The robbery and assault of Pretlow resulted in Petitioner's seventh arrest and his third
(continued...)

the police was introduced to the jurors being literally read into evidence; that reading went

uncontested by the prosecution in light of Petitioner's decision not to testify.  Importantly here,

the read-into-evidence Petitioner's statement provided quite a different account of the events.

According to that statement, Petitioner and Taylor were simply relaxing at Petitioner's

home in Pennsylvania when Speller suddenly showed up and asked them to go to New Jersey in

order to "pick up some money from a friend."[4]  Petitioner agrees and volunteered to drive his

wife's Toyota Camry.  Allegedly, there were no weapons taken by the three for the trip.

Moreover, according to Petitioner's statement, when the three entered Pretlow's apartment,

Speller and Pretlow began arguing, and that argument turned into a fight, although Petitioner

tried to prevent it.  Petitioner denied ever touching Pretlow.  And while he conceded seeing

Speller take the safe, he claimed that the safe's content belonged to Speller, being the very

money which Speller wanted to "pick up from a friend."  Moreover, Petitioner's statement

asserted that the shotgun recovered in his wife's Camry must had been Pretlow's own.[5]

Petitioner's defense counsel named, initially, two persons as witnesses for defense, one of

them being Speller and the other being Petitioner's wife.  However, as the trial and Petitioner's

---

[3](...continued)
conviction. His two prior convictions resulted from guilty pleas, one was entered on the charges
of possession of instruments of crime, robbery, theft by unlawful disposition, theft by receiving
stolen property, assault, conspiracy, and carrying a firearm in a public place; while the other was
entered in connection with the charges of resisting arrest, assault and aggravated assault.  See
Docket Entry No. 7, at 50.

[4]  In his statement, Petitioner had a problem referring to Speller by name, using either
Speller's nick-name (known to a few people but not used by Speller in a fashion to qualify this
nick-name as Speller's alias) or various misspelled/misstated versions of Speller's name.

[5]  Pretlow and his fiancée testified to never having any shotguns, handguns or bullets, etc.

post-conviction relief ("PCR") record established, Speller was withdrawn as Petitioner's witness after the defense attorney representing Speller informed Petitioner's counsel that Speller would not testify in light of Speller's own upcoming trial and associated Fifth Amendment rights.

On January 17, 2002, the jury returned a guilty verdict against Petitioner.   Five days later, that is, on January 22, 2002, when the sentencing stage of Petitioner's trial was still to come, Speller executed a statement beginning with a sentence "I Michael Speller, is [sic] making this statement without the consent from my Attorney and freely and voluntarily writing about the [events] of June 24th 1998 [i.e., the date of Pretlow's robbery]."   Speller notarized that statement two days later, that is, on January 24, 2002, and the so-notarized statement made its way to Petitioner's defense counsel right prior to Petitioner's sentencing.

Speller's statement was a narrative corresponding, largely, to Petitioner's version of events, although the details provided in Speller's statement were invariably geared to exculpation of Speller himself.  Specifically, the statement asserted that: (a) Speller engaged Petitioner to drive to the Pretlow's place in order to "pick up [only Speller's rightful] belongings!"; (b) Taylor was not invited, rather he asked to join the ride and was so allowed; (c) upon arrival to Pretlow, Speller introduced Petitioner as his buddy (but did not so-refer to Taylor); (d) Petitioner and Taylor made their own way into Pretlow's apartment and sat civilly on the couch, while (e) Speller remained in the corridor with Pretlow talking about picking up Spellers clothing, sneakers and $2,500; (f) Pretlow allegedly refused to give Speller any money and stated that he did not know where Speller's bag with clothing/sneakers was, in response to which (g) Speller called Pretlow a liar because Speller allegedly saw his bag in a corner of the hall; (h) Speller's exclamation allegedly caused Pretlow to hit Speller in the face; (i) in response to that, Speller

began kicking Pretlow, "but [allegedly, Speller] did not hurt [Pretlow] at all!"; (j) Petitioner allegedly heard the commotion and went into the corridor, where he allegedly grabbed Speller to prevent further "non-hurting" of Pretlow and told Pretlow that Speller "only want[s] his cloths damn it!"; (k) at which point Taylor allegedly came in and, all over sudden, started kicking Pretlow while Pretlow (who, apparently, was already brought down to his hands and knees as a result of prior "non-hurting") began crawling into the bedroom; since (l) Speller, meanwhile, could not remember the combination to the safe, he just took the entire safe unopened (with all its content, but without even knowing whether there was any cash or valuables inside) and, on the way, also asked Taylor to take the bag with Speller's "cloths" which Speller allegedly saw in a corner of the hall; (m) in the car, right before driving away, Speller allegedly asked Taylor whether he got that bag; to which (n) Taylor replied that yes, but Speller, somehow, developed the need to check the content of the bag; (o) as Speller opened the bag, he allegedly saw shotgun shells and a holster, and said to Taylor, "this isn't my sh-t" but – instead of disposing of this foreign items, still elected to toss the bag to the car floor at the backseat; (p) as he was starting the car, Speller suddenly noticed such an allegedly previously-unnoticed-by-him detail as the shotgun and so he allegedly asked Taylor why did Taylor "take this sh-t," getting Taylor's response that Taylor wanted to sell it; and (q) apparently satisfied with that answer and the items obtained from Pretlow, Speller began driving, taking Taylor, Petitioner, the safe, shotgun, holster, etc. with him.  See Docket Entry No. 7, at 84-86 (quoted language, including exclamation marks, in original).

　　　　Since Speller's aforesaid statement did not indicate, in any way, that Speller was willing to testify in Petitioner's defense (and, moreover, did not contain any text suggesting that Speller

executed his statement with any goal or interest to assist Petitioner rather than himself only),

Petitioner's counsel introduced Speller's statement as newly-discovered evidence, requesting

retrial.  During the colloquy with regard to such measure, Petitioner's prosecutor took the

position that Speller's statement should not give basis to retrial.  In connection with that position,

the prosecutor observed that – without Speller's testimony – Petitioner's statement to the police

(asserting effectively the same, i.e., that Petitioner was merely present during Speller's taking of

his "belongings") was submitted to Petitioner's jurors uncontested.  The prosecutor pointed out

that it would not be the case had Speller been put on the stand, noting that Taylor's statement,

heavily inculpating Petitioner in both the robbery and, especially, in assault on Pretlow, would

have been necessarily introduced to impeach the credibility of Speller's statement and to suggest,

derivatively, that Petitioner's exculpatory statement to the police was, too, a lie.  Elaborating on

these points, Petitioner's prosecutor noted as follows:

> [Because of the way the trial went, Petitioner's trial court] had the opportunity of .
> . . reading the statement of [Petitioner into evidence] during his trial.  It was
> presented to the jury. . . . [T]he statement of Mr. Speller [and] the statement of
> [Petitioner] are fundamentally the same.  And I'm not suggesting that there — that
> there's plagiarism in the sense of the same words or the same actual descriptions
> he used.  But the fundamental description of what took place and the role of
> various players in their two statements are virtually identical [which raises a
> question as to credibility of these statements] . . .  I note that Mr. Taylor, for
> instance, was not similarly listed as a potential witness [for Petitioner.  One might
> wonder why].  Mr. Taylor had, in fact, given a prior taped statement when he was
> arrested.  Mr. Taylor's taped statement was considerably more inculpating as to
> [Petitioner's] involvement [in Pretlow's robbery] than what Mr. Speller['s
> statement suggests].

Docket Entry No. 7-1, at 147 (replicating relevant portions of the transcript).

Petitioner's application for introduction of Speller's statement as newly-discovered

evidence was denied by Petitioner's trial judge, and Petitioner's judgement of conviction and

sentence were entered.  Petitioner appealed both his conviction and sentence to the Appellate

Division asserting, <u>inter</u> <u>alia</u>, that Speller should have been called as his defense witness.  The

Appellate Division affirmed Petitioner's conviction but altered Petitioner's sentence as to the No

Early Release Act aspect.  Petitioner's application for certification was denied by the Supreme

Court of New Jersey.  Petitioner then sought PCR remedy, rehashing his claim based on Speller's

statement into a claim that his counsel was ineffective by failing to find a way for Speller to

testify in Petitioner's defense.  Petitioner, again, did not offer any document or testimony from

Speller suggesting that Speller would actually testify in Petitioner's defense; rather, Petitioner's

PCR application: (a) stressed that the content of Speller's statement largely mirrored Petitioner's

statement; (b) asserted that Petitioner's counsel should have found some way to learn about the

content of Speller's statement before that statement was executed and then should have found

some way to put Speller on the stand; and (b) sought an evidentiary hearing.

During the PCR proceedings, Petitioner's defense counsel verified that Speller was

unattainable due to Speller's counsel's position (<u>i.e.</u>, that Speller should not testify), and

Petitioner's court accepted that position as a factual finding.  Petitioner's PCR application was

denied on a multitude of procedural and substantive grounds, and no evidentiary hearing was

found warranted.  Petitioner appealed that determination to the Appellate Division, which

affirmed the Law Division's conclusions.  Petitioner's application for certification was denied by

the Supreme Court of New Jersey.  After that, the instant Petition followed.

## III.    THE PARTIES' SUBMISSIONS

As noted <u>supra</u>, Petitioner submitted his Petition and traverse.  In his Ground One,

Petitioner asserted that his PCR court erred in denying him evidentiary hearing.  In his Ground

11

Two, Petitioner – asserted as his de jure challenge – a claim that the PCR court erred in

dismissing Petitioner's allegations against his trial counsel on procedural grounds.  However,

seemingly recognizing that his PCR court also dismissed this line of allegations on merits,

Petitioner de facto maintained that his trial counsel violated his Sixth Amendment rights by not

finding a way to put Speller on the stand.  Petitioner's traverse indicated that Petitioner's de facto

line of Ground Two challenges was meant to be based on the Compulsory Process Clause of the

Sixth Amendment, as detailed in Washington v. Texas, 388 U.S. 14 (1967).

While, as the first paragraph of this Opinion indicates, Petitioner's challenges are,

substantively, without merit, the quality of Petitioner's pro se traverse greatly exceeds the quality

of the answer produced by Respondent, since the traverse indicated Petitioner's familiarity with

the applicable standard of review and his good faith attempt at conducting some form of a legal

analysis.  In contrast, Respondent's answer is quite disappointing.  It consists of two entries, each

mounting a 213-page messy submission.  See Docket Entries Nos. 7 and 7-1.  The first of these

submissions opens with an 8-page "answer," which: (a) is stripped of any legal discussion (short

of a few brief excerpts from the state courts' decisions rendered as a result of Petitioner's PCR

and appellate challenges); (b) is executed in an unorthodox style more fit for a friendly colloquy

than a legal document, e.g., utilizing such instructions to the Court as, "Remember, this was fully

addressed and rejected in the direct appeal"; and (d) could be reduced, without any loss to the

value of Respondent's legal position, as stated (or, better to say, as unstated), to its mere closing

sentence reading, "respondent urges that this Petition for **Habeas Corpus** relief be summarily

dismissed and no writ issued."  Docket Entry No. 7, at 8 (capitalization, as well as lack thereof,

bolding and underlining in original).  That "answer" is followed by an index of Respondent's

exhibits (with references to hand-marked pagination, which references, alas, fail to fully

correspond to the pages marked and, hence, necessitated the Court's study of all 426 pages).

Although the quality of Respondent's answer is quite disappointing, the Court is

constrained – by the letter of law – to agree with the gist of Respondent's conclusion, i.e., that

Petitioner's instant application does not warrant habeas relief.  The Court, therefore, will deny

the Petition on the basis of the Court's own analysis, as detailed below, treating Respondent's

submission as if it contained no answer at all (i.e., as if only the exhibits were submitted): in that

sense, the Court will be granting Respondent's facially odd request for a "summary" dismissal.

**IV.    DISCUSSION**

**A.    Challenges Based on Lack of Evidentiary Hearing During PCR Proceedings**

Petitioner's Ground One is based exclusively on state law (asserting that state procedural

rules were erroneously applied); it alleges that Petitioner was wrongly denied an evidentiary

hearing during his PCR proceedings.  However, "errors of state law cannot [automatically] be

repackaged as federal errors," Johnson, 117 F.3d at 110, since "it is well established that a state

court's misapplication of its own law does not generally raise a constitutional claim."  Smith, 120

F.3d at 414.  Moreover, Petitioner has no federal right to an evidentiary hearing or other relief

denied by a state PCR court.  Infirmities in a state PCR proceeding do not raise constitutional

questions in a federal habeas action.  See Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir.

1998) ("what occurred in the petitioner's collateral proceeding does not enter into the habeas

calculation"). Since errors in state post-conviction relief proceedings are collateral to the

conviction and sentence and do not give rise to a claim for federal habeas relief, see id.,

Petitioner's Ground One asserting a violation of his constitutional rights by denial of PCR

evidential hearing necessarily fails to state a claim meriting habeas relief.  Therefore, his Ground One challenges will be dismissed without further discussion.

### B.    Challenges "Incorporated" In Petitioner's Ground Two

As noted supra, Petitioner's challenges against his trial counsel build on Petitioner's reading of the Compulsory Process Clause of the Sixth Amendment, as detailed in Washington v. Texas, 388 U.S. 14.[6]  However, since Petitioner misreads both the goal of the Compulsory Process Clause and the holding of Washington, Petitioner's so "incorporated" challenges are without merit.

It is well-settled that an erroneous exclusion of evidence which is relevant and material to the defense violates one's Sixth Amendment right to present a defense.  See Washington, 388 U.S. at 18-19.  In that vein, the Sixth Amendment, applicable to state criminal trials through the Due Process Clause of the Fourteenth Amendment, guarantees a defendant the "right to offer the testimony of witnesses, and to compel their attendance, if necessary." Id. at 19.  "The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words." Taylor v. Illinois, 484 U.S. 400, 407-09 (1988).  However, the aforesaid right to compulsory process for obtaining witnesses addresses the problem of *state* interference in the defendant's ability to call witnesses on his behalf.  For instance, this interference may take the form of a state evidentiary rule, as it was in Washington, where the state rule disqualified an alleged accomplice from testifying on behalf of the defendant.  Or this interference may take other forms, such as a state prosecutor's action of encouraging and assisting

---

[6]  These "incorporated" challenges appear to be unexhausted.  However, if Petitioner's unexhausted claims are facially meritless, this Court can invoke its § 2254(b)(2) mandate to dismiss these unexhausted claims on merits, rather than on the lack-of-exhaustion grounds.

14

two paid informants to leave the state before a defendant's trial, as it happened in <u>Lockett v. Blackburn</u>, 571 F.2d 309 (5th Cir. 1978).

Conversely, Petitioner cannot set forth a meritorious compulsory process claim if, as here, he does not allege that the *state* interfered with his ability to call a witness.  In other words, Petitioner's assertion that Speller should have been called as a defense witness could operate as nothing more than a potential ground for his ineffective assistance of trial counsel claim.  Thus, this Court will discuss these challenges only in connection with the Counsel Clause of the Sixth Amendment: read as moored to the Compulsory Process Clause, Petitioner's claim is factually inapposite to both the Clause and <u>Washington</u>.  As such, it has no merit and must be denied.

### C.    Petitioner's Challenges Based on the Counsel Clause

#### 1.    Governing Legal Standard

The Sixth Amendment, applicable – as noted <u>supra</u> – to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  <u>Id.</u> at 687-88.[7]  The court must then determine whether, in light of all the

_____

[7]  <u>See</u> <u>also</u>, <u>Strickland</u>, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the
(continued...)

circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.  See id.

　　To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.   As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.[8]

### 2.　　Petitioner's Position Is Without Merit

　　Here, Petitioner asserts that his defense counsel had to find a way to make Speller testify at Petitioner's trial.  However, the record established that Petitioner's counsel was planning to call Speller as a witness and even put him on the witness list, but could not have his intentions

---

[7](...continued)
wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy").

　　[8]  The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

materialize since Speller's counsel informed Petitioner's counsel that Speller's testimony would be unavailable in light of Speller's own upcoming trial. During Petitioner's PCR proceedings, the state court determined such unavailability as a fact. Factual issues determined by a state court are presumed to be correct, and Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing U.S.C. section 2254(e)(1)); see also Duncan, 256 F.3d at 196 (same). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001). Here, Petitioner offers this Court no evidence whatsoever suggesting that, during the guilt phase of Petitioner's trial, Petitioner's counsel had even any reason to think that Speller would be willing to testify in Petitioner's defense. Thus, the Court has no reason to disturb the state court's factual finding that Speller was not willing to waive his Fifth Amendment rights in order to assist Petitioner.

If so, Petitioner's counsel could not compel Speller's testimony; the same applied to Petitioner's trial judge: there is no Supreme Court precedent granting power to any court or counsel to compel the appearance and testimony of a potential witness who has invoked his Fifth Amendment privilege against self-incrimination. See United States v. Moussaoui, 382 F.3d. 453, 466-67 (4th Cir. 2004).

Seemingly cognizant of this point, Petitioner asserts that, even if Speller was unavailable in light of Speller's own upcoming trial, Petitioner's counsel was constitutionally obligated to arrange for Petitioner's trial to be so postponed that it would occur right after rather than right before Speller's trial. Petitioner's position to that effect seems to be based on his belief that Speller's Fifth Amendment privileges would have necessarily turn into a pumpkin at the stroke

of Speller's conviction.  However, Petitioner errs as to the life-span and/or durability of Fifth

Amendment privileges: "a convicted defendant retains his Fifth Amendment privilege as to

subsequent proceedings against other defendants at least until the time he no longer retains the

right to file a timely notice of appeal."  People v. Butler, 2001 Cal. App. Unpub. LEXIS 987

(Cal. Ct. App. Dec. 6, 2001) (addressing this very issue and citing People v. Fonseca, 42 Cal.

Rptr. 2d 525 (1995) (detailing the rationale for a durable and lengthy Fifth Amendment right)).

Hence, a delay of Petitioner's trial would not dissolve Speller's Fifth Amendment protections.

Moreover, Petitioner never presented this Court (or even the state courts) with an affidavit from

Speller indicating that Speller would be willing to testify in Petitioner's defense, ever.  All

Petitioner presented is Speller's statement establishing Speller's interest in exculpating himself

but leaving the Court to guess whether and when Speller might be willing to testify for Petitioner.

    This observations highlight the shortcomings of Petitioner's Strickland claim.

    During his PCR proceedings, Petitioner argued that his counsel's failure to call Speller as

Petitioner's witness could not possibly been defined as a strategic choice since Petitioner's

counsel placed Speller on the witness list; from that observation, Petitioner's PCR application

deduced that Petitioner necessarily met the first prong of Strickland.[9]  This deducement is

incorrect, since the first prong of Strickland – while amenable to strategy-based considerations –

does not turn only on the presence or absence of a legal strategy with regard to each counsel's

_____

    [9]  Petitioner's Ground One challenges were left rather undeveloped, that is, in terms of the
Strickland analysis, focusing mainly on the Compulsory Process Clause aspects and, mistakenly,
mixing in a brief conflation of the issues of federal habeas evidentiary hearings and state PCR
evidentiary hearings.  This Court, however, being mindful of Petitioner's pro se status and taking
notice of Petitioner's good faith efforts to mount a legal position, finds it warranted to factor into
Petitioner's instant claim those federal law aspects which he raised during his state proceedings.

action taken or omitted.  Rather, the first prong broadly requires a showing "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88.

Here, Petitioner's counsel: (a) was informed, during the guilt phase of Petitioner's trial, that Speller was unavailable for testimony; and (b) could reasonably conclude that Speller would keep invoking his Fifth Amendment privileges for, at the very least, many months to come.  In other words, Petitioner's counsel had no means or reason to fancy that Speller would ever execute a notarized statement exculpating himself and, as an up-shot, would ever indicate that Petitioner's conduct was less egregious than that described by State witnesses.  With the same token, Petitioner's counsel – same as this Court now – could not predict if Speller would ever be willing to testify for Petitioner.  Therefore, Petitioner's counsel's decision to accept the reality of Speller's counsel's statement (i.e., that Speller would not testify, taking the Fifth Amendment privilege for as long as it would be available to Speller) could not fall below an objective standard of reasonableness: defense counsel are neither expected to be clairvoyants nor they are obligated to stay ignorant of the realities which arise in the course of litigation and which hinder or alter these counsel's initially-planned modes of defense.  See United States v. Harms, 371 F.3d 1208, 1212 (10th Cir. 2004) ("The Sixth Amendment does not require counsel . . . to be clairvoyant").

Thus, Petitioner's Strickland-based claim fails even with regard to the first prong and, as such, warrants dismissal.  However, the Court takes its analysis one step further by presuming, for the sake of argument, that the mere fact of Petitioner's counsel succumbing to the circumstances (i.e., accepting, as a fact, Speller's counsel information that Speller would not

19

testify) might, somehow, amount to a conduct allowing Petitioner to meet the first prong of the

Strickland test.  However, even such presumption cannot salvage Petitioner's Ground Two.

      Here, the body of evidence presented at trial against Petitioner was nothing short of

overwhelming.  Pretlow, the victim, testified detailing Petitioner's physical attack on him and, in

addition, spelling out all aspects of the robbery.  Filgham verified Pretlow's testimony as to the

perpetrator's escape and items in their hands.  Police and medical investigations established

bleeding injuries on Pretlow's body, as well as blood and signs of altercation in Pretlow's

apartment.  Police examination of Pretlow's safe determined the items stolen and verified the

information provided by Pretlow and his fiancée.  Police pursuit of Petitioner's wife's car, in

which Petitioner, Speller and Taylor were making their escape, resulted in recovery of all items

stolen and all weapons used to assault and scare Pretlow, in complete coherence with the

statement given by Pretlow to the police at the time when the assailants were trying to flee from

the car (i.e., long before Pretlow had a chance to find out what items and weapons were

recovered in the car).  Pretlow's fiancée verified Pretlow's testimony that no weapons were kept

in Pretlow's apartment.  In sum, all ends of the State's position met and were well detailed.

      In light of the foregoing, Petitioner and Speller's claims that they tried to peacefully

collect from Pretlow the items that rightfully belonged to Speller appear facially not credible.

Against this balance-of-evidence context, any introduction of Speller's testimony, effectively

duplicative of Petitioner's statement (which was read to the jurors) would aid little– if at all –  to

Petitioner's defense, since a reasonable juror would likely conclude that Speller was seeking to

exculpate himself and lend a favorable testimony to Petitioner merely in order to explain why his

request to Petitioner to drive him to Pretlow's place was "innocent" rather than conspiratorial.

Conversely, introduction of Taylor's statement (which inculpated Petitioner, and which would be admissible to impeach Speller's testimony, see Tennessee v. Street, 471 U.S. 409, 413-14 (1985); see also Crawford v. Washington, 541 U.S. 36, 59 (2004)), could have stripped Petitioner even from those few shreds of advantage, which Petitioner gained as a result of having his own exculpatory statement to the police read into evidence – unchallenged.  Cf. Bruton v. United States, 391 U.S. 123, 136 (1968) (observing than the damning effect stemming from the introduction of a co-defendant's confession is extremely high).  Thus, while Petitioner's counsel might have hoped to gain some marginal advantage for Petitioner from introducing Speller's testimony (or might have believed that this advantage could balance off the disadvantages ensuing from the likely impeachment, or he might have even hoped for the prosecutor to act laxly and not notice this golden opportunity for impeachment), the totality of evidence in Petitioner's case indicates no reasonable probability that, had Speller's testimony been introduced (and, especially, introduced and impeached), the factfinder would have had a reasonable doubt with respect to Petitioner's guilt as to the charges upon which he was actually convicted.[10]  It follows that Petitioner's Ground Two also fails to meet the second prong of Strickland.  In light of the foregoing, the state court's dismissal of Petitioner's challenges against his trial counsel was not an unreasonable application of Supreme Court precedent, and Petitioner's Ground Two claim to the contrary merits not habeas relief.  Therefore, his Petition will be dismissed in its entirety.

---

[10]  Notably, Speller's attempts to exculpate himself and inculpate Taylor did not succeed. While Speller, Taylor and Petitioner were all convicted on robbery charges (and, indeed, it would be peculiar had they not been so convicted, granted their unquestionable taking of the safe with Pretlow's documents, his fiancée's jewelry and cash exceeding, in the amount, even the figure Speller claimed to be "his"), Speller – same as Petitioner – was convicted on *both* robbery and assault grounds, while Taylor's version of the events (collaborated by testimonies of all State witnesses) yielded his conviction on the robbery charges *only*.  See supra, note 2, this Opinion.

**D.**   **Certificate of Appealability**

The Court must now determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.

The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "[A] petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, the Court is persuaded that jurists of reason would not disagree with this conclusion.  Therefore, no certificate of appealability will issue.

**V.   CONCLUSION**

For the foregoing reasons, this Court dismisses the Petition and denies Petitioner a writ of habeas corpus, pursuant to  28 U.S.C. § 2254.  No certificate of appealability will issue, pursuant to 28 U.S.C. § 2253(C)(2).

An appropriate Order accompanies this Opinion.


s/Robert B. Kugler
**ROBERT B. KUGLER**
United States District Judge


Dated: March 14, 2011

22